In the matter of the reorganization of the ELEVENTH WARD
BUILDING AND LOAN ASSOCIATION OF NEWARK, NEW
JERSEY.

[Argued February 13th, 1941.   Decided September 19th, 1941.]

416

*Mr. Jerome C. Eisenberg,* for the appellants.

*Mr. Halsey W. Stickel (Mr. John E. Toolan,* of counsel), for the respondents and cross-appellants.

*Mr. David T. Wilentz,* Attorney-General, and *Mr. Louis J: Cohen,* Assistant Attorney-General, for the Commissioner of Banking and Insurance.

The opinion of the court was delivered by

HEHER, J.

Dissident shareholders appeal from a final decree in Chancery approving as "fair and equitable" (with certain modifications) a plan of reorganization of the Eleventh Ward Building and Loan Association of Newark, New Jersey, formulated under *R. S. 1987, 17:12-105, et seq.*, as amended by chapter 255 of the Laws of 1939. The cross-appeal challenges the allowance of a fee to their solicitor and counsel.

*First:* Error is asserted in the "interpretation, construction, and application of the provisions of the statute."

It is said that the legislature has not furnished "definitions or standards for determining 'fairness' and 'equitableness;'" that Chancery "is not limited in its power to do equity," and "the burden is placed squarely upon the conscience of the Chancellor;" that resort to the common usage of these statutory terms is merely "the substitution of one abstraction for another," and "leads nowhere;" that "what is fair and what is equitable will vary with innumerable circumstances"—*i. e.,* the "nature of the community in which the association is situated; the association's financial condition; the nature of its assets; the financial responsibility of those indebted to the association; the nature of the investments affected; the necessity to the community for the continuance of an association," and "the effect of reorganization upon the savings of members;" that the particular plan has "an indispensable provision"—*i. e.,* "the borrowing of $3,000,000 from the Reconstruction Finance Corporation and the pledging of assets of the Association to secure the loan;" that, for the court below "intelligently" to determine "whether the plan was fair or unfair, or equitable or inequitable, it should acquaint itself with the nature of the assets that would be answerable for the repayment of the debt;" that, "for all the court knew, the assets were in such condition that they could be readily sold and in that manner afford the Association the cash which it deemed necessary to embark upon its new career," and, "if that were true, it would be unfair and inequitable to all those concerned to provide for the pledge of the assets, and thus

incur interest charges of $10,000 a month, a considerable price to pay for the 'liquidity' of a new venture;" and that therefore the court below "failed and refused to carry out and perform the statutory duty imposed upon it," and hence erred in matter of substance.

The specific point is not now available to appellants. The petition of dissent did not explicitly raise the question of the necessity for the pledge thus made. In this respect, it averred merely that it was "impossible to ascertain from the information made available to members, whether the Plan is in fact in the best interest of members, because" (a) *"Exhibit C,* the statement upon which the entire Plan is founded, is not included therein;" and (b) "without complete information as to the present market value of the assets of the association, no determination whether the Plan is fair and equitable can properly be made." *Exhibit C* is the balance sheet of the association as of July 31st, 1939; and the members were advised that it was open for inspection at the association's office "at any time during business hours."

*Section 17:12-106* of the cited statute provides that "all members" of the association "who shall not have dissented from such reorganization plan in the manner" therein provided "shall be conclusively deemed to have assented thereto;" that "any member who shall dissent from the proposed plan, shall file a petition of dissent, in writing, in the Court of Chancery," setting forth "the grounds upon which such member dissents" therefrom, "at least five days before the day appointed for the meeting of members called to consider and vote upon such plan;" and that the court shall thereupon "hear and dispose of the matter summarily, and, if satisfied that the plan is equitable and fair, shall make an order approving the said plan, and dismissing such petition."

Specification is of the essence of the statutory scheme, for a plan of reorganization of this character ordinarily deals with complex financial problems, and particularization is a constituent of the procedural order and expedition requisite to the effectuation of the statutory remedy.

Granting that the court may *sua sponte,* in the public interest, consider matters not so specified, it is plainly not

under a duty so to do; and there is no adequate reason for such intervention here.

It is proved that the loan was designed "to increase the assets in the new Association and increase the percentage of share value insured or available to the shareholders in such new Association." Thus the association would be provided with means to meet the just demands of its shareholders without the substantial sacrifice of value that would necessarily be entailed by a sale of its real estate under conditions now obtaining. The evident purpose is to achieve an essential state of liquidity and to conserve the corporate assets in a manner that will at once subserve the interests of the shareholders and advance the public welfare; and the formula is reasonable and appropriate to that end. The plan received the approbation of the Federal Savings and Loan Insurance Corporation, the Federal Home Loan Bank, and the Reconstruction Finance Corporation as one fairly promotive of these objectives; and the evidence supports the findings of the Commissioner of Banking and Insurance and the court below that the plan in this respect is "fair" and "equitable," and wholly in keeping with the statutory policy. It provides that the "aggregate amount" of the assets of the old association transferred to the new (Bradford Savings and Loan Association), including the proceeds of the loan made by the Reconstruction Finance Corporation, "shall be at least sufficient to guarantee to the holders of shares of the Old Association, * * * shares of the new Association in an amount equal to not less than 45% of the value of their shares in the Old Association" and for the issuance of a "certificate of interest" equivalent to the remaining 55% in the old or liquidating corporation, and for insurance of the members' share accounts with the Federal Savings and Loan Corporation and membership in the Federal Home Loan Bank of New York.

Such associations have general power to borrow money on the security of their property. *R. S. 1937, 17:12-11.* And they are likewise empowered to borrow money "necessary or convenient to effect the reorganization, without limitation as to amount, and upon such terms and upon such security as the plan of reorganization shall provide." *R. S. 17:12-107,*

as amended. In determining whether the proposal is "fair" and "equitable" in this behalf, it is not without significance that appellants comprise 1.57% of the total membership, and represent but 3.05% of the share liability of the association.

The terms "fair" and "equitable" connote means reasonably adapted to the exigency and equality measured by the contractual rights of the shareholders *inter se* and all of the other parties in interest.

It is frivolous to suggest that, for aught that appears, these realty assets are "readily salable," and so the pledge is "unfair" and "inequitable." It was proved that the pledge consists of "slow" or "frozen" assets that could not be liquidated without great loss. There was no evidence to the contrary; nor did appellants make a tender of such. Indeed, the court would have been justified in taking judicial notice of conditions warranting this conclusion. An inquiry into the value of these assets would necessarily have been prolonged and expensive, and the delay might well have been prejudicial. That would have been pure formalism utterly devoid of service to the substantial rights of the parties. In the circumstances, such proof having been introduced, it was requisite that appellants make a specific offer of evidence to the contrary; and that they failed to do.

As stated, the court deleted certain provisions of the formula as "unfair and inequitable;" and it is also contended under this head that in such situation the sole function of Chancery is to disapprove the plan in its entirety, and therefore the action taken constituted an excess of power. It is said that the modifications thus made were not sanctioned either by the Commissioner of Banking and Insurance or the shareholders, and that each is a *sine qua non*. We do not share this view.

Provision was made for that eventuality. It was stipulated that the "unenforceability or invalidity of any one or more of the provisions, clauses, sentences and/or sections" of the plan "shall not render any of the other provisions, clauses, sentences and/or sections * * * unenforceable or invalid;" and it was declared that the "intention of those

adopting and approving" the plan was "to permit the intent and purpose \* \* \* to be carried out despite the unenforceability or invalidity of any one or more of the individual provisions, clauses, sentences and/or sections" thereof.

The items thus expunged are in no sense of the essence of the "intent and purpose" of the plan as originally adopted by the shareholders; and so it is that, by express provision, their exclusion did not serve to invalidate the design as a whole. And this procedure is not condemned by the statute. *E contra,* it is implicit in the legislative scheme.

Furthermore, it would seem that ordinarily it is not the dissenting but the approving shareholders who may interpose the objection that the modifications have impaired the substance of their agreement.

*Second:* Next, it is urged that the statute (*section 17:12-107,* as amended) is unconstitutional in so far as it provides "for the crediting of the book value of shares pledged to secure mortgage loans against the principal amount of such loans in reduction thereof."

The course of reasoning is that the enactment (*R. S. 1937, 17:12-1, et seq.,* as amended) provides for "complete mutuality and equality" in "all transactions between the association and its members, and between the members *inter se,*" and the "device adopted by the reorganization statute, and by the Plan, destroys that element of mutuality which was inherent at the inception of membership," in that "it gives borrowing members full credit for dues paid on shares pledged as security for a mortgage loan, without compensating payments to other members," and "it does not appear that the measure adopted is one upon which the Plan depends for its successful operation." It is not contended that "under no circumstances may an association 'recast' or refinance its mortgage loans and give credit for dues paid upon shares," but rather that "a blanket provision for granting such credits, without regard to necessity, affects only private rights and is not essential to fulfillment of a public purpose," and "it deprives installment shareholders, like the petitioners-appellants, of the equal protection of the laws," in violation of the Fourteenth Amendment of the Federal Constitution. The

insistence is that it does not represent a valid exercise of the police power, for its "sole effect * * * is the disturbance of private rights," and the end is therefore not public. The argument is made that it is "one thing to conserve assets from forced liquidation," and "another thing to provide the means for continuance of business for all purposes." The first is conceded to have a public aspect justifying the interposition of the police power; the second is characterized as essentially private, on the hypothesis that such associations "are convenient instrumentalities, but not essential ones."

But the purposes thus designed to be served are reasonably identified with the essential public interest. Reorganization under the statute is effective only in case the Commissioner of Banking and Insurance shall be satisfied, "as a result of an examination or otherwise," that the association's "share liability, creditor obligations, and liability for unpaid taxes * * * exceeds the fair value of its assets," or that "the condition of such association is unsound by reason of its ownership of real property in an excessive amount in proportion to its other assets, or that the aggregate amount of defaulted mortgages held by such association is excessive, and if, in the opinion of the Commissioner the plan of reorganization so submitted to him will remedy the situation so found by him to affect such association, or that its adoption will further the interests and will be beneficial to the members and creditors of such association and to the community in which it is located." *R. S. 1937, 17:12-106,* as amended. The rehabilitation of associations so circumstanced indubitably serves the common good and welfare. The legislature had in mind, not only the benefits thereby accruing to the members and creditors of such associations, but the public need as well; and it is undeniable that such institutions have a major bearing upon the state's economy. We need not particularize. *Vide Bucsi* v. *Longworth Building and Loan Association, 119 N. J. Law 120; Veix* v. *Sixth Ward Building and Loan Association, 123 N. J. Law 356; affirmed, 310 U. S. 32; 60 S. Ct. 792; 84 L. Ed. 1061; Sommer* v. *Workingmen's Building and Loan Association, 125 N. J. Law 83; Veix* v. *Seneca Building and Loan Association, 126*

*N. J. Law 314; Hopkins Federal Savings and Loan Association* v. *Cleary, 296 U. S. 315; 56 S. Ct. 235; 80 L. Ed. 251; Treigle* v. *Acme Homestead Association, 297 U. S. 189; 56 S. Ct. 408; 80 L. Ed. 575.*

It suffices to say that the statute has a two-fold aspect—*i. e.,* the orderly liquidation of an insolvent association with a view to safeguarding the interests of its members and creditors, and also the common weal, and its continuance under a new charter, not only for those purposes but also for service to the public in a field indisputably affected with a public interest. Continued function is of the essence of the statutory scheme. The instant plan of reorganization is designed to serve this legislative policy, and the particular provision is a component part thereof and takes the category of means reasonably adapted to the end sought, and is in no sense arbitrary or oppressive.

The crediting of full share values in reduction of mortgage loans in such reorganizations is generally approved as prudent financing. It places all mortgages on a sound investment basis; and the lessening of the mortgagor's burden thereby accomplished obviously tends to the common benefit through the avoidance of defaults and foreclosures. Here, the need for "direct reduction" was found; and the finding is factually well-grounded. The association's incapacity for normal function was due in large measure to the economic stress of the past decade and the incidental stagnation of the real estate market. Landowners were unable to sustain their mortgage obligations and the result was a real estate burden beyond the capacity of the association to bear. "Direct reduction" of mortgage loans, upon the application of the individual "borrower," is permissive under the association's constitution; and it was the established practice of this association to "recast" individual mortgage loans in the exercise of this authority. It was proved that the association held "straight reduction" mortgages totaling $1,818,645.61, nearly all of which originally were "sinking fund" mortgages "recast" on the same basis as that provided for the remaining sinking fund mortgages in the proposed reorganization. As found by the learned Vice-Chancellor, "all the mortgages

were so recast except 28, on which the principal sum owed is $127,500," secured by shares having a "present value of * * * $62,460."

Share insurance has been made an essential term of the plan of reorganization. The federal insuring agency considers such course indispensable to "sound economical home financing" by such associations, and has made it a prerequisite to such insurance. And it was proved that the provision is "universal" in "reorganization cases." It is basic in the statutory design for orderly liquidation and rehabilitation; and, where this permissive authority is invoked to serve the statutory end, it does not contravene the cited constitutional precept. Here, there is no basis for the assertion that the plan is not dependent upon this course for its "successful operation."

It is the further insistence of appellants that they were denied the right "to adduce proof to substantiate their contention" that "the basic determination by the legislature in enacting" the statute "was contrary to fact." The offer was "to adduce evidence tending to prove that building and loan associations are not in fact institutions vested with a public interest to the extent claimed for them," and that "their operations are such that there is now virtually no difference between a building and loan association and a private money lending institution." There was no further specification of the evidence thus tendered; and we perceive no ground for holding that there was error in the ruling so made. These institutions are incontrovertibly subject to regulation in the public interest; and provision for orderly and efficient liquidation, and continuance of function for that purpose, are so plainly within the legislative scheme as to be beyond fair challenge. Such associations are essentially *quasi*-public corporations designed to "advance the common weal." They are chartered "to encourage thrift and promote the ownership of homes, with powers and immunities peculiarly their own;" and "the state as the representative of the public has an interest apart from that of the individuals affected." *Hopkins Federal Savings and Loan Association* v. *Cleary, supra*. This state has asserted such to be its public policy;

and so the proffered evidence, so far as it was revealed, would have been clearly immaterial. *Vide Bucsi* v. *Longworth Building and Loan Association, supra.*

It is also contended that, assuming the "general objects of the act are constitutional," the means for their attainment are deficient in the essentials of due process, in that (1) the time fixed "for the filing of a petition of dissent is so short" as to be "oppressive and unreasonable;" and (2) "the lack of a requirement  *  *  *  that the members be given full information in every detail of the plan [a technical and complex document] sufficiently in advance of the meeting to afford them the opportunity for critical analysis and unhurried judgment, is likewise oppressive and unreasonable." These grounds are untenable.

It is ordained that there be "at least ten days' notice" to the shareholders of the meeting at which the plan approved by the Commissioner of Banking and Insurance is to be considered, and that the petition of dissent shall be filed in the Court of Chancery "at least five days before the day appointed" for such meeting.

Concededly, this provision did not work prejudice here. Twenty days' notice of the meeting was given; and, granting that in special circumstances the statutory notice might not be sufficient, the question is whether appellants have been denied due process of law, and that must be answered in the negative. *Pittsburgh Steel Co.* v. *Baltimore Equitable Society, 226 U. S. 455; 33 S. Ct. 167; 57 L. Ed. 297.* Compare *Doty* v. *Love, 295 U. S. 64; 55 S. Ct. 558; 79 L. Ed. 1303.*

And it is not essential to due process that the statute specifically direct that the members "be given full information in every detail of the plan sufficiently in advance of the meeting" to afford opportunity for study. Here, all pertinent data was made available to the shareholders in due season; and there is no showing of prejudice in this behalf. None of the appellants was denied information material to the subject-matter.

*Third:* It is also urged that the court below erroneously denied appellants "a review of the Commissioner's approval

of the Plan." The specific point advanced is that the statute "makes itself operative in cases where the liabilities of the association exceed the fair value of assets, or where the condition of the association is unsound;" that "these are preliminary findings of fact which the Commissioner must make;" that "the court below failed and refused to permit the petitioners-appellants to take testimony to determine whether the Association here involved was within the category of associations entitled to take advantage of the extraordinary remedy afforded by the Reorganization statute, and whether the Commissioner's findings and his approval were based upon facts;" that "it was this that the petitioners-appellants sought to review;" and that the "court below denied them that right, thereby establishing the Commissioner as a court of last resort in the determination of the preliminary facts."

But the petition of dissent, following allegations that it "is impossible to ascertain from the information made available to members whether the Plan is in fact in the best interests of members," and that the "Plan illegally prefers certain classes of members above others" in stated particulars, ten in number (including those herein discussed), and is therefore "unfair and inequitable," avers that "the approval of the Commissioner of Banking and Insurance * * * to the Plan does not comply with the statutes in such case made and provided," and "it cannot be demonstrated, nor should it be taken for granted, that the reorganization" of the association "is in the public interest; and if the approval of the Commissioner of Banking and Insurance * * * carries with it that finding or determination, your petitioners ask for a review of such findings."

Thus it is that the single question specifically raised respecting the existence of the jurisdictional prerequisites was whether the proposed reorganization was "in the public interest."

At a hearing on affidavits, the plan was disapproved as unfair and inequitable in certain particulars, and its fulfillment was enjoined. Thereafter, an order was entered permitting the association and the appellants to take proofs on

certain specified matters, and denying appellants leave "to submit proof" (a) that "building and loan associations, as presently constituted, are not affected with a public interest because the bulk of·the mortgages held by them represent loans to non-members and persons who are only technically members who have no substantial investment interest, because the chief source of fresh funds employed by such associations is derived not from contributions by members, but from loans made from governmental agencies;" (b) that the reorganization statute "is not enacted to accomplish a public purpose, but affects private rights and relationships only;" (c) as to the "value of the assets which are to be pledged to the R. F. C. to secure the $3,000,000 loan so that it may be determined whether the value of the collateral has any reasonable relation to the amount of the loan, and so that it may be determined whether there is any necessity for the making of such a loan;" and (d) that the plan of reorganization "is not in the public interest because the community in which it will operate is adequately served by other institutions affording the same facilities for savings and borrowings, and because on reorganization, there would be no outlet for investment of funds which is consistent with the purposes for which building and loan associations are created." On July 24th, 1940, testimony was taken pursuant to this order. On July 29th, counsel for appellants announced that, "in lieu of further proofs," it had been agreed to submit a stipulation, which was admitted in evidence. On the ensuing October 25th, counsel for appellants interposed an "Application for Continuance," embodying a prayer for leave to argue certain questions and "an opportunity to present evidence" as to certain matters—among others, that "the basis for the approval of the plan of reorganization by the Commissioner * * * is contrary to fact." The application was denied.

In view of the failure of appellants to raise this precise question in their petition of dissent, not to mention the untimeliness of the proffer of evidence (assuming, without deciding, that it was fairly embracive of the matters now presented), the judicial action thus complained of is not tainted with error.

There was in fact a full review of the Commissioner's approving action in respect of all issues properly raised in the court below.

*Fourth:* The next insistence is that the plan "exhibits deficiencies which call for its rejection."

## A.

The proposed constitution for the government of the new association provides that "all proxies shall be filed with the secretary of the association at least five days before the meeting;" and the contention is that it "is in derogation of the right of the member to vote by proxy" under *R. S. 1937, 17:12-37,* conferring upon members the unqualified right to vote by proxy "if the constitution so provides."

This regulation does not contravene the letter or spirit of the statute. It is designed to secure the statutory voting right, and is in no sense unreasonable or arbitrary.

## B.

The plan provides that "Withdrawals, which may be filed with the New Association, shall be paid in accordance with the laws" of the State, "and the rules and regulations of the Insurance Corporation;" and, though it is conceded that the present regulations of the Insurance Corporation on the subject of withdrawals are in no sense "contrary to our statute or policy" it is said that "it is impossible to tell what changes the future will bring," and, since the provision "affects only private rights," it is void.

*Section 17:12-119* of the statute empowers such associations to effect share insurance with the Federal Savings and Loan Insurance Corporation as provided by Title IV of the National Housing Act (*12 U. S. C. A. § 1726*); and it is not to be presumed that there will be amendments of these rules in conflict with our statute law or public policy. The disposition of that question may well await the occasion.

## C.

The plan designates the officers and directors of the new association; and the insistence is that this is repugnant to *R. S. 1937, 17:12-23,* providing that the directors shall be members and shall be elected by the members.

We have no occasion to determine whether this statutory direction is applicable to the reorganization of an "insolvent" or "unsound" association. The point was not raised either in the petition of dissent or in the subsequent proceedings in the court below; and, on well-settled principles, it cannot be raised here for the first time.

## D.

It is also maintained that the plan's disposition of reserves deprives appellants of "their inalienable rights."

The provision deals with reserves "heretofore established by the Old Association by assessment charged against members as of March 31st, 1933." It directs that such part thereof as shall remain after liquidation of assets shall be divided "on an equitable basis to the members or former members of the Old Association whose shares have heretofore been impaired and affected by the assessments" imposed in the creation of the reserve. No fault is found with this. The complaint is directed to the subsequent clause providing that, if there be any surplus thereafter, it "shall be distributed *pro rata* to the holders of the Certificates of Interest." It is said that this is "confiscatory," since it makes for the participation of "persons who did not contribute to the reserve"— *i. e.,* "persons who became members of the Association after the reserves were created out of profits and dues paid in," in violation of orders for the establishment and distribution of reserves made by the Commissioner of Banking and Insurance under chapter 48 of the Laws of 1933. *P. L. p. 94; R. S. 1937, App. A:7-3.*

But the orders thus asserted to have been made by the Commissioner are not in proof. The learned Vice-Chancellor overruled the contention on the ground that there was no

showing that "any of the dissenters contributed to the reserve;" and he stated in his memorandum that, "If it shall become necessary to take proofs in this matter, the dissenters will be given opportunity to show that they did contribute to the reserve and to prove the facts relative to the reserve." Appellants did not avail themselves of the opportunity.

Moreover, the provision directs that the "unused portion of such reserve shall be *returned* and paid over on an *equitable basis*" to the members or former members whose shares have been "impaired and affected" by the assessments levied to create the reserve. More than this is not their due. The balance remaining is the property of the association and distributable as such. *Morristown Institution for Savings* v. *Roberts, 42 N. J. Eq. 496; Thirteenth Ward Building and Loan Association* v. *Weissberg, 115 N. J. Eq. 487.* The court below would not have been warranted in branding the plan as "unfair" or "inequitable" on this score.

*Fifth:* Lastly, it is urged that there was error in the denial of appellants' motion that the association be assessed with "their expenses reasonably and necessarily incurred." We do not have this view.

The expenses thus classified total $1,162.52. They include an item of $700 for "advertising." We find no basis in the evidence for the conclusion that these disbursements were "necessary" and "reasonable." Apart from this, we think that in the special circumstances the denial of the application is fairly classable as the exercise of a sound discretion.

*Sixth:* The cross-appeal raises the question of the propriety of the allowance of a fee to appellants' counsel. It is not well-grounded.

While it is the rule that, where each of the contending parties is successful in part, neither is ordinarily entitled to counsel fees as against the other, it is not applicable in the circumstances here presented. The inquiry was in the common interest, and it was indubitably undertaken and pursued in the utmost good faith. It resulted in a modification of the plan; and, in such circumstances, it would be inequitable to put the burden of counsel fees upon the appellant shareholders.

Decree affirmed.

No. 239 with 241—

*For affirmance*—THE CHIEF-JUSTICE, PARKER, BODINE, DONGES, HEHER, PERSKIE, PORTER, DEAR, WELLS, WOLFS-KEIL, RAFFERTY, HAGUE, THOMPSON, JJ. 13.

*For reversal*—CASE, COLIE, JJ. 2.

No. 241 with 239—

*For affirmance*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, WOLFSKEIL, RAFFERTY, HAGUE, THOMPSON, JJ. 15.

*For reversal*—None.